
# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **MARGARET MITCHELL, AS ADMINISTRATRIX OF THE PENDING ESTATE OF ANTHONY DON MITCHELL,** )<br>)<br>)<br>)<br>) | |
| **Plaintiff,** ) | |
| ) | **CIVIL ACTION NUMBER:** |
| v. ) | **2:23-cv-00182-SGC** |
| ) | |
| **SHERIFF NICK SMITH, IN HIS INDIVIDUAL AND OFFICIAL CAPACITY, CORRECTIONS OFFICERS T.J. ARMSTRONG, DENZEL MITCHELL, BRAXTON KEE, BAILEY GAINEY, KATHERINE CLIGAN, JACOB SMITH, JEREMY FARLEY, RICHARD HOLZMAN, BENJAMIN SHOEMAKER, DAYTON WAKEFIELD, NURSE PRACTITIONER ALICIA HERRON, NURSE BRAD ALLRED, AND INVESTIGATOR CARL CARPENTER,** )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| **Defendants.** ) | |

## PLAINTIFF'S RESPONSE TO MOTION TO STRIKE

**I.      Defendants Filed Their Original Motion in Violation of Rule 11.**

Any motion for sanctions pursuant to Rule 11 "must be made separately from any other motion" and that the motion "must be served under Rule 5, but it must not

1

be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets." Fed. R. Civ. P. 11(c)(2).

Paragraph 7 of Defendants' original motion states:

> A reasonable sanction is an order dismissing this case with prejudice and directing Plaintiff to pay the Defendants' attorney fees and costs expended in defense of this case. Rule 11(4), Federal Rules of Civil Procedure. Plaintiff and the conduct of her counsels exceeded the bounds of proper litigation. Harsh sanctions are warranted to dissuade Plaintiff counsels and others from engaging in such intentional and dangerous behavior.

(Doc. 7 at 6). As the Eleventh Circuit has noted, "when a litigant identifies a filing that he believes violates Rule 11 … he can draft a sanctions motion and serve it on the opposing party. But he cannot file that motion just yet. Instead, service of the motion notifies the opposing party of the possible violation and starts the 21-day safe harbor clock." *Huggins v. Lueder, Larkin & Hunter, LLC*, 39 F.4th 1342, 1346 (11th Cir. 2022).

In its "corrected" motion (Doc. 8) Defendants, *sub silentio*, removed paragraph 7. Explaining this change (or not), Defendants' "corrected" motion includes a footnote stating that Defendants filed the "corrected" motion "to remove a typo found in the original motion." (Doc. 8 at fn1). But the request for sanctions Defendants removed is hardly an unintentional "typo." Defendants' premature filing

of a baseless request for sanctions and its attempt to characterize that request as a "typo" is only the beginning of the factual inaccuracies in its motion.

Defendants' references to the media are also interesting when placed in their fuller context. Several articles appeared online highlighting the original Rule 11 sanctions motion shortly after defense counsel filed it.[1] One of the articles includes an embedded copy of the motion for sanctions that does not bear an electronic filing stamp, seeming to indicate that defense counsel sent the motion for sanctions to the reporter before the motion was filed.[2] As of 3:00 PM on March 6, 2023, there has been no correction to the story or any other indication that defense counsel provided the reporter with the "corrected" version filed later that evening.

As Defendants note, Plaintiff's complaint was also picked up by the media, but the media attention started before this complaint was filed. Rather than being triggered by Plaintiff's complaint, media attention was drawn, first, by the fact of Mitchell's death, itself a significant and newsworthy event.[3] The real surge in media coverage came after a video began circulating on social media directly contradicting in the most graphic terms Defendant Armstrong's statement on behalf of the sheriff

---

[1] https://community-journal.com/2023/03/wcso-seeks-dismissal-sanctions-against-mitchell-attorneys-in-court-filing/ (last access 3:00 PM 3/6/2023);
https://www.al.com/news/2023/03/tony-mitchell-never-placed-in-walker-county-jail-freezer-filing-states-scandalous-claims-merit-harsh-sanctions.html
[2] https://drive.google.com/file/d/1ITy-HDQsU5H9-afBjcaLihE9HsvKqgXk/view,
[3] https://www.cbs42.com/news/local/an-alabama-man-was-arrested-during-a-welfare-check-two-weeks-later-he-was-dead/

to a news agency that Mitchell was "alert and conscious" when he left the Walker County Jail immediately prior to arriving at Walker County Baptist Hospital with an internal body temperature of seventy-two degrees or lower.[4] Media attention was driven not by the Estate or their lawyers but by the horrifying nature of the facts of this case, and by the Sheriff's Department's attempt to keep these facts under wraps.

## II. Before Defendants Filed their Corrected Motion, Defendant Had Plaintiff's Response Letter.

Footnote one of Defendants' "corrected" motion is not the only incorrect statement of fact in Defendants' motion. Footnote 2 is also incorrect. That footnote states: "On February 28, 2023, Defendants served Plaintiff's counsel a letter and a draft Motion for Sanctions as required by Rule 11 Federal Rules of Civil Procedure. In the letter, Defendants offered Plaintiff counsels the opportunity to review the video obtained in the case. As of the filing of this Motion to Strike, Plaintiff's counsels have not contacted Defendants to view the video and have not withdrawn the baseless and scandalous allegations."

Contrary to this footnote, Defendants received Plaintiff's response to its Rule 11 correspondence several hours before Defendants filed the "corrected" motion. The email attaching the response is attached as Exhibit A to this filing, along with the letter itself. As noted in counsel's letter, far from ignoring Defendants' offer to

---

[4] https://www.cbs42.com/digital-exclusive/police-said-an-alabama-man-was-alert-and-conscious-when-he-left-their-jail-video-shows-otherwise/

4

view the video, Plaintiff's counsel indicated that they were not able to come to view the video in defense counsel's office due to scheduling issues and the need for an expert to review the video, and instead requested that Defendant provide it with copies of the surveillance video and body camera footage suitable for submission to an expert, along with other relevant documents. (EX A). Plaintiff's counsel's response to the Rule 11 correspondence further states, "we look forward to you producing the information requested above. Once we have had a chance to review these documents and information, we will certainly revisit the allegations of the complaint and determine whether any changes or corrections are needed." (EX A).

## III. Defendants Misrepresent the Allegations of Plaintiff's Complaint.

A third area in which Defendants' motion fails to state correct facts is that Defendants claim that Plaintiff alleges Mitchell was definitely placed in a freezer. However, this is not what the complaint alleges. Each time the complaint mentions the word "freezer" it states that Plaintiff was "likely" placed in a freezer "or similar frigid environment." Plaintiff has never claimed to have direct evidence of what means Defendants used to bring Plaintiff's temperature to 72 degrees or lower.

Compelling circumstantial evidence shows that Mitchell was exposed to a freezer or similar frigid environment during the last twenty-four hours of his life. As stated in the complaint, at 6:00 AM on the morning of January 25, 2022, when Karen Kelly went off her shift, Mitchell was awake and talkative in his isolation cell and

not in any evident distress. By the time Mitchell arrived at Walker Baptist Hospital on the morning of January 26, his body temperature had plummeted to seventy-two degrees Fahrenheit or even lower. In the absence of extreme environmental cold, no medical condition can explain an over twenty-degree-Fahrenheit loss of body temperature in such a short time for a person who remains alive. Contrary to the speculation in footnote 3 of Defendants' motion that some medical cause may be at fault, "there is no medical disease or natural cause that would explain a body temperature dropping that low," at least in the opinion of Jefferson County Chief Deputy Coroner Bill Yates, based on his review of the excerpts from the medical records quoted in the complaint as quoted in a news story about this case.[5] The extreme drop in body temperature shows that Tony was exposed to a freezer or similar frigid environment during the last twenty-four hours of his life.

    Based on Plaintiff's investigation, there is a freezer and another cooler in that jail. If Defendants had another means of bringing an inmates' body temperature to 72 degrees or lower, Plaintiff will uncover that during the discovery phase of this case and amend her complaint accordingly. However, the freezer is certainly one of the few possible logical explanations for how Mitchell was exposed to fatally frigid conditions during his incarceration at the jail. Plaintiff's counsel is not alone in

---

[5] https://abc3340.com/newsletter-daily/no-comment-from-walker-co-sheriff-nick-smith-on-allegations-inmate-froze-to-death-anthony-mitchell-federal-lawsuit-wrongful-death

thinking this. In the opinion of a physician discussing hypothermia in a published interview concerning this case, "If his [Mitchell's] core temperature was truly 72 degrees, he was in a freezer."[6]

## IV. Defendants May not Use a Motion to Strike to Litigate Disputed Facts and Contested Theories of Liability.

In their motion to strike, Defendants attempt to expand Fed. R. Civ. P. 8(a)'s "short and plain" standard into a tool for pruning Plaintiff's complaint of all "allegations and sections that either directly or indirectly allege that Mitchell was placed in a freezer and/or died of hypothermia due to Defendants' conduct." (Doc. 8 at 4). The "drastic remedy" of a motion to strike is not appropriate here, where the allegations in question go directly to disputed issues of fact establishing liability.

It has long been the rule in this circuit that "the action of striking a pleading should be sparingly used by the courts. … It is a drastic remedy to be resorted to only when required for the purposes of justice. … The motion to strike should be granted only when the pleading to be stricken has no possible relation to the controversy." *Augustus v. Bd. of Pub. Instruction*, 306 F.2d 862, 868 (5th Cir. 1962). "A disputed question of fact cannot be decided on a motion to strike." *Id.*

Defendants' motion seeks to strike all the "allegations and sections that either directly or indirectly allege that Mitchell was placed in a freezer and/or died of

---

[6] https://www.wbrc.com/2023/02/17/local-doctor-explains-death-hypothermia-amid-allegations-man-froze-death-inside-walker-co-jail/

7

hypothermia due to Defendants' conduct." (Doc. 8 at 4). The sections that Defendants seek to strike include "Introduction, Heading H, I and M, Paragraphs 4, 5, 48, 66, 67, 68, 69, 70, 72, 74, 76, 77, 78, 87, 99, 111, 112, 113, 119, and 121." (Doc. 8 at 4). Defendants provide no authority for the proposition that it should be allowed to rewrite Plaintiff's complaint to remove all allegations of intentional misconduct by Defendants, all allegations regarding Mitchell being exposed to a freezer or similar frigid environment, and other factual allegations that Defendant seeks to dispute simply because it does not view those allegations as "short and plain." But "short and plain" is not the relevant pleading standard. Rather, the factual allegations in the complaint must be "plausible."

    As stated by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009):

> [t]o survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to "state a claim to relief that is plausible on its face." [*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,] 570, 127 S. Ct. 1955, [167 L. Ed. 2d. 929 (2007)]. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id. at 556, 127 S. Ct. 1955. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* . . .
>
> Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. . . . Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. [*Iqbal v. Hasty*, 490 F.3d

> 143, 157-58 (2d Cir. 2007) *rev'd, Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868]. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"—"that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

*Id.* at 678-79. In the §1983 deliberate indifferent context, a plaintiff must plead "specific facts from which an inference could be drawn that a substantial risk of harm exist[ed]." *Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003). Where defendants raise a qualified immunity defense, as defendants have done here, a "heightened pleading" standard applies. *Harper v. Lawrence Cty., Ala.*, 592 F.3d 1227, 1233 (11th Cir. 2010). Under this standard, a plaintiff must allege facts with "sufficient detail for [the d]efendants to understand what alleged rights were violated . . . and which of their actions allegedly violated those rights." *Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1180 (11th Cir. 2009).

Defendants may not like the factual details in the complaint. Defendants may believe they can dispute some of those facts. But "[a] disputed question of fact cannot be decided on a motion to strike," *Augustus v. Bd. of Pub. Instruction*, 306 F.2d at 868. Simply because Plaintiffs' allegations provide more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," that is not a basis to strike them. *Iqbal*, 556 US at 678-79. Because Defendants' motion to strike is transparently a mere vehicle for attacking disputed allegations directly relevant to liability in this matter, the motion to strike is due to

9

be denied in its entirety. *See Augustus v. Bd. of Pub. Instruction*, 306 F.2d at 868 ("A disputed question of fact cannot be decided on a motion to strike.")

Turning to details, many of the allegations that Defendants seek to strike are supported by direct video evidence. The complaint's introduction summarizes Plaintiff's theories of liability and the factual evidence and should not be struck, as it summarizes the allegations that follow. Defendants seek to strike Paragraph 4, which refers to Plaintiff "spending fourteen days incarcerated under hellish conditions as a pretrial detainee at the Walker County jail." The hellish conditions referred to are documented in the videos Plaintiff's counsel has obtained, including a video of Mitchell, naked, being dragged out of holding cell number five, likely on or around January 15, 2023, and tazed. (EX B, IMG_0946.MP4). Another video similarly shows Mitchell being tackled naked by guards while emerging from a shower and being dragged out of an office area by the feet. (EX C, IMG_0947.MP4).

Defendants further seeks to strike Paragraph 5: "Tony's internal body temperature was 72 degrees Fahrenheit when he arrived at Walker Baptist Hospital in the back seat of a sheriff's vehicle on the morning of January 26, 2023, brought there by sheriff's deputies who did not even bother to call an ambulance for him despite his obvious need for emergency medical treatment." However, Plaintiff has direct video evidence showing deputies carrying Plaintiff and placing him into the back seat of a sheriff's vehicle. This is direct evidence that deputies did not bother

to call an ambulance to transport him to the hospital. (EX D, IMG_0261.MP4). The footnote on page 3 of Defendants' motion suggests an intent by Defendants to dispute "that Mitchell's temperature was properly taken at the hospital." (Doc. 8 at 3). However, Plaintiff has medical records showing that Mitchell's rectal body temperature was 72 degrees Fahrenheit at the hospital. (EX E, Excerpt from Medical Records). And a motion to strike is not a vehicle for litigating disputed issues of fact.

Defendants further seek to strike paragraphs 66 and 67, which state that "The heroic corrections officer who preserved the security camera footage after Tony's death last saw him alive at 6:00 AM on the morning of Wednesday, January 25, 2022, when she went off her shift" and that "[a]t that time, Tony was awake and talkative in the isolation cell in the booking area and not in any evident distress." Defendants may dispute these facts, but Karen Kelly, the corrections officer in question, obviously may offer testimony to support them. Far from having "no possible relation" to this action, these facts reinforce the inference that Mitchell was exposed to frigid temperatures during the last twenty-four hours of his life, between the time Karen Kelly saw him at 6:00 AM and 4:00 AM the following day. *Augustus v. Bd. of Pub. Instruction*, 306 F.2d at 868. Defendant's objections to facts 68, 69, and 70 are similarly frivolous. For instance, Defendants may dispute that room temperature in the jail is approximately 72 degrees, as set forth in paragraph 68; however, this is not a fact with "no possible relation" to this action involving

hypothermia. *Id*. Paragraph 69 and 70 summarizes inferences that may be drawn from the surrounding facts to explain Mitchell's severely hypothermic condition.

Defendants further seek to strike facts 76, 77, and 78, which state that "This means that after Tony was removed from the walk-in freezer or other frigid environment, at least five hours passed before he was transported to Walker County Medical Center, despite his obvious serious medical need for emergency medical treatment throughout that time" and "Hour by hour, Tony's chances of survival dwindled, as captured in a series of chilling surveillance videos preserved by a heroic corrections officer so that Tony's family would know what happened to him." And "(t)he first video that the Estate has from the morning of January 26, 2023, was captured at approximately 4:00 AM. This is after Tony has been returned to the isolation cell in the booking area from the freezer or other frigid environment." Far from having "no possible relation" to this action, these allegations chronicle the deliberate indifference that Tony experienced as he lay dying from hypothermia in a bare concrete cell. (EX F, IMG_0256.MP4; EX G, IMG_0257.MP4; EX H, IMG_0258.MP4; EX I, IMG_0259.MP4; EX J, IMG_0260.MP4). To the extent Defendants object to "at approximately 4:00 AM", a 4:01 AM time stamp is visible at the start of the first video referenced in these paragraphs. (EX F, IMG_0256.MP4).

Defendants further seek to strike paragraph 87 of the complaint, which states that "Instead of calling an ambulance or providing Tony with medical attention,

Benjamin Shoemaker and Morgan Madison focus their energies on sweeping trash out of the cell, in which the lights are now turned off, and cleaning it, evidently sweeping or mopping around Tony as he lies dying on the floor, removing signs of the squalor in which Tony was forced to spend his final days." However, this paragraph fairly describes the video referenced in this paragraph, attached as Exhibit H to this response. (EX H, IMG_0258.MP4). Again, this allegation is highly relevant to establishing these individuals' deliberate indifference. While Defendants may dispute that they had this state of mind, the allegation is not one that "has no possible relation to the controversy." *Augustus v. Bd. of Pub. Instruction*, 306 F.2d at 868.

Next, Defendants seek to strike Paragraph 99, which states, "Deputies did not inform hospital staff that Tony had been placed in a freezer or other frigid environment or that he was hypothermic. Doctors learned Tony was hypothermic only when they took his temperature after beginning emergency resuscitation efforts. Learning that Tony was hypothermic caused physicians to immediately change their course of treatment, as the measures they had initially employed were inappropriate to resuscitate a person who is severely hypothermic." This paragraph is supported by Mitchell's medical records, which contain a physician's note stating as follows:

> The patient received immediate BLS and was bagged and chest compressions were started. There was no IV access visible because of his drug abuse. An IO was obtained in the left proximal tibia and also the left humerus. Patient received intranasal Narcan and then additional drugs per ET tube after he was successfully intubated with 1 attempt

>using the glide scope. Additional drugs were then given through the IO needles. Dr. Packer assisted in the resuscitation by placing a central line in the right femoral vein which was then used for all other resuscitation. **The patient received numerous rounds of epinephrine and also atropine and bicarb. After it was determined that he was severely hypothermic no other cardioactive drugs were given**. The patient was placed on external compression device and he was placed on ventilator and **ACLS was continued with the plan to warm him up to approximately 30 centigrade and then initiate cardioactive drugs and possible defibrillation.** His rhythm remained asystole with occasional PEA and occasional VFib. He was shocked twice but there was no response as would be expected in a severely hypothermic state.

(EX E, Excerpt from Medical Records) (emphasis added). The medical records fully support these allegations, which are relevant to show that the doctors did not receive information about Mitchell's severely hypothermic state from jail personnel, resulting in physicians initially giving "numerous rounds of epinephrine and also atropine and bicarb" before "it was determined that he was severely hypothermic" resulting in them changing their course of treatment to warm Mitchell to 30 centigrade before again "initiat[ing] cardioactive drugs and possible defibrillation." This allegation is highly relevant to deliberate indifference, as a reasonable factfinder could well infer that deputies' failure to communicate Mitchell's hypothermic state resulted in a further delay of appropriate warming treatment.

Defendants further seeks to strike Paragraph 111, 112, 113 and 119, which lay out Plaintiff's theories of liability and identify the defendants to whom the theories

14

apply. Again, these paragraphs are not allegations with "no possible relation to the controversy." *Augustus v. Bd. of Pub. Instruction*, 306 F.2d at 868. They are merely allegations that Defendants do not like, or hope to dispute, and Defendants cannot get rid of such allegations through a motion to strike. Defendants further seek to strike paragraph 121, which alleges that "Due to these policies, practices, and/or customs, acts of misconduct amounting to excessive and/or gratuitous force or gratuitous and/or sadistic infliction of pain and deliberate indifference to inmates' medical needs are tolerated by the Sheriff and his deputies, and the sheriff has a policy or practice of covering up such acts of misconduct rather than disciplining the officers involved. As such, officers believed they were free to engage in such acts and ignore serious medical needs without regard to the rights of detainees at the jail and without any fear of consequences or discipline." Again, however, this is a theory of liability that Defendants may dispute either legally or factually. It is not, however, an allegation with "no possible relation" to this action such that Defendants may avoid the allegation entirely through the vehicle of a motion to strike.

As set forth above, Defendants' motion to strike should be denied in its entirety.

                          Respectfully submitted,

                          **/s/ L. William Smith**
                          Jon C. Goldfarb
                          L. William Smith
                          Christina M. Malmat
                          Counsel for Plaintiff

**OF COUNSEL**:
WIGGINS, CHILDS, PANTAZIS,
FISHER, & GOLDFARB, LLC.
The Kress Building
30119th Street North
Birmingham, Alabama 35203
Telephone No.: (205) 314-0500
Facsimile No.: (205) 254-1500

## CERTIFICATE OF SERVICE

I hereby certify that on this day the 6th day of March, 2023, a true and correct copy of the above and foregoing document has been properly served via the Court's electronic filing system to the following counsel of record:

J. Randall McNeill
WEBB MCNEILL WALKER PC
One Commerce Street, Suite 700
Post Office Box 238
Montgomery, AL 36101-0238
(334) 262-1850 T
(334) 262-1889 F
rmcneill@wmwfirm.com

                                              /s/ L. William Smith
                                              OF COUNSEL