FILED

2023 Mar-20  AM 09:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **MARGARET MITCHELL, AS ADMINISTRATRIX OF THE ESTATE OF ANTHONY DON MITCHELL,** | ) ) ) ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NUMBER:** |
| **v.** | ) | **2:23-cv-00182-SGC** |
| | ) | |
| **SHERIFF NICK SMITH, IN HIS INDIVIDUAL AND OFFICIAL CAPACITY, JAIL ADMINISTRATOR JUSTIN WHITE, CORRECTIONS OFFICERS ARTHUR "TJ" ARMSTRONG, DENZEL MITCHELL, ARCELIA JOTTIE TIDWELL, BRAXTON KEE, BAILEY GANEY, KATHERINE CLINGAN, JACOB SMITH, JEREMY FARLEY, RICHARD HOLTZMAN,  BENJAMIN SHOEMAKER, MORGAN MADISON, DAYTON WAKEFIELD, JOSHUA JONES, QCHC, INC., NURSE PRACTITIONER ALEISHA HERRON, NURSE BRAD ALLRED, AND INVESTIGATOR CARL CARPENTER,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| **Defendants.** | ) | |

## FIRST AMENDED COMPLAINT

1

### I. **Jurisdiction and Venue**

1.     This action arises under the Fourteenth Amendment to the United States Constitution and under federal law, including 28 U.S.C § 2201, 42 U.S.C. §§ 1983 and 1988.

2.     This Court has original jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1343.

3.     Venue is proper in the Northern District of Alabama because the injuries complained of occurred within this district consistent with 28 U.S.C. § 13912(b).

### II.     **Parties**

1.     Margaret Mitchell is the mother of Decedent Anthony "Tony" Mitchell, and the administratrix of the Estate. In her capacity of Administratrix, Mitchell adopts and ratifies this First Amended Complaint.

2.     Sheriff Nick Smith is sued in his individual and also in his official capacity as the Sheriff of Walker County. At all times relevant at this action, Sheriff Nick Smith acted under color of law.

3.     Justin White is the Jail Administrator for the Walker County Sheriff's Office. He is sued in his individual capacity. At all times relevant to this action, he acted under color of law.

4.     Corrections Officers Arthur "T.J." Armstrong, Arcelia Jottie Tidwell, Denzel Mitchell (no relation to Tony), Braxton Kee, Bailey Ganey, Katherine Clingan,

Jacob Smith, Jeremy Farley, Richard Holtzman, Benjamin Shoemaker, Morgan Madison, Dayton Wakefield, and Joshua Jones are corrections officers or former corrections officers employed by the Walker County Sheriff's Department. Each is sued in his or her individual capacity. At all times relevant to this action, each individual acted under the color of law.

5.    Nurse Practitioner Aleisha Herron and Nurse Brad Allred are medical care providers employed by QCHC, Inc. ("Quality Correctional Health Care"), the private medical contractor in the jail. Each is sued in his or her individual capacity.

6.    QCHC, Inc., by and through its agents Herron and Allred, engaged in the practices complained of herein with deliberate indifference and/or malice to Tony's federally protected rights. At all times relevant to this action, QCHC, Inc. and its staff acted under color of law in that they performed a traditional state function as the provider of medical care to individuals incarcerated at the Walker County Jail.

7.    Investigator Carl Carpenter is an investigator employed by the Walker County Sheriff's Department. At all times relevant to this action, he acted under color of law.

### III.    Statement of Facts.

#### A.    Introduction.

1.    Anthony Don Mitchell, known to his family as Tony, was a thirty-three-year-old man with a history of drug addiction. He was also a beloved son and brother.

2.      Up until late 2022, Tony lived with his father at a house on Lost Creek Road in Carbon Hill. Tony's father died in late 2022. After his father's death, Tony lived alone in the house. Tony's mother, Margaret Mitchell, paid his power and water bills and dropped off food for him.

3.      After the death of his father on August 31, 2022, in a story familiar to so many Americans, Tony appears to have spiraled into worsening drug addiction, and his physical and mental health precipitously declined.

4.      Tony passed away on January 26, 2023, at Walker Baptist Medical Center while in the custody of the Walker County Sheriff's Department. He died after spending fourteen days incarcerated under horrendous conditions as a pretrial detainee at the Walker County Jail, from January 12 to January 26, 2023.

5.      Tony's internal body temperature was at most 72 degrees Fahrenheit when he arrived at Walker Baptist Hospital in the back seat of a sheriff's vehicle on the morning of January 26, 2023, brought there by sheriff's deputies who did not call an ambulance for him despite his obvious need for emergency medical treatment.

6.      The emergency room physician who treated Tony, and spent over three hours trying to resuscitate him, wrote the following note in Tony's medical records:

> I am not sure what circumstances the patient was held in incarceration but it is difficult to understand a rectal temperature of 72° F 22° centigrade while someone is incarcerated in jail. The cause of his hypothermia is not clear. It is possible he had a underlying medical condition resulting in hypothermia. I do not know if he could have been

exposed to a cold environment. I do believe that hypothermia was the ultimate cause of his death.

### B.    Tony Is Arrested in a Psychotic and Delusional State.

7.    The last member of Tony's family to interact with him was Steve Mitchell, Tony's cousin. On January 12, 2023, Tony showed up at Steve's house. Steve had last seen his cousin three months before at the time of Tony's father's burial.

8.    Steve didn't initially recognize the man who appeared at his house. Tony, who was six foot three or four, had previously weighed over two hundred pounds. Tony was haggard and emaciated, weighing no more than a hundred forty or a hundred fifty pounds.

9.    Wearing socks but no shoes, Tony informed Steve that he wanted to tell him a secret no one else knew.

10.    Obviously delusional, Tony told Steve that he, Tony, had a brother who had been stillborn, which was true, though this occurred in 1984, five years before Tony was born. Tony further told Steve that his parents had put the baby brother's body in a box that was hidden in the attic of his house, which was not true and was delusional. Tony believed that he needed to tear out a wall in the attic so he could find the box his baby brother's body was in.

11.    Tony further believed there were two portals in his house: one to heaven and one to hell. Tony believed that he needed to put the box with his baby brother's body in the portal to heaven so his baby brother could go there and be with his father.

12.    Steve realized immediately that his cousin, having lost an extensive amount of healthy weight, having lived evidently in complete isolation during recent months, and spouting delusions about portals to heaven and portals to hell, was in serious need of psychiatric help. This was not the Tony that Steve knew and loved.

13.    Not wanting to let Tony out of his sight, Steve agreed to go with Tony to Tony's house and help him look for the box.

14.    At the house, Tony continued to be delusional. Even after Steve and Steve's adult son Jacob climbed up into the attic with him and showed Tony that the box wasn't there, Tony insisted that the box with his baby brother's remains was hidden behind an exterior wall that he needed to tear out.

15.    Steve and Jacob left Tony at the house, saying they would return with tools to tear out the wall to help Tony find the portal. Steve, not knowing how else to get help for his cousin, attempted to contact the Walker County Sheriff's Department. When he couldn't reach anyone at the Sheriff's Department, Steve eventually decided he had no choice but to call 911.

16.    Steve asked the 911 dispatcher if they could send someone to go check on his cousin. He told the dispatcher that Tony was talking out of his head about portals to heaven and hell, and that he appeared to be having a mental breakdown and that he was in an extremely degraded condition. The dispatcher asked if an ambulance was needed, and Steve told her that would be a good idea.

17.    When Sheriff's officers arrived at Tony's house on Lost Creek Road, they encountered Tony in the same obviously delusional and psychotic state that Steve had experienced earlier that afternoon.

18.    A written statement released from the Sheriff's Office on Facebook states, in part, "When Deputies arrived, they observed Mitchell in the front yard of the residence. Mitchell immediately brandished a handgun, and fired at least one shot at Deputies before retreating into a wooded area behind his home."

19.    More officers arrived, including the SWAT team, and Tony was eventually arrested in the woods behind his home.

20.    A picture posted by the Sheriff's Department reportedly within minutes of Tony's arrest shows Tony with his face covered with a black substance.

21.    The Defendant, Walker County Sheriff Nick Smith, was personally at the scene, supervising Tony's detention and arrest. Likewise, the Defendant T.J. Armstrong, the public information officer for the Sheriff's Office, was personally at the scene.

22.    In close proximity to Tony at the time of his arrest, Armstrong took the photo of Tony being apprehended and posted it from his phone at the scene to the Sheriff Department's Facebook page. Within hours, the picture of Tony with his face covered with a black substance spread across social media.

23.     Steve Mitchell, Tony's cousin, was also at the scene with Tony's mother, Margaret Mitchell, at the time of Tony's arrest.

24.     After Tony's arrest, Steve spoke with Defendant Armstrong. Armstrong told him that Tony was alive, although a little "roughed up," that he'd taken a shot at the officers, and they were planning to charge him.

25.     At the time of his arrest, Tony suffered from serious medical and psychiatric needs, including but not limited to severe drug addiction, psychosis, and malnourishment.

26.     Armstrong and every other officer at the scene were consciously aware of Tony's serious medical needs. Showing this, Armstrong told Steve that they were going to set Tony's bond high enough that he would not be able to bond out, and assured Steve that Tony would receive medical evaluation and treatment in jail. Armstrong told him, "We're going to detox him and then we'll see how much of his brain is left," or words to that effect.

27.     After observing Tony in a Sheriff's Department vehicle with what appeared to be black residue on his face, Steve asked Defendant Armstrong why his face looked like that.

28.     Armstrong and every other officer at the scene were consciously aware of Tony's serious medical need for acute psychiatric treatment. Showing this, Armstrong told Steve that Tony had informed the deputies that he had spray painted

his own face black because he was planning to enter a portal to hell located inside his house.

**C.    Tony Is Housed Naked in BK5, a Bare Unlit Concrete Isolation Cell.**

29.    Tony was housed as a pretrial detainee at the Walker County Jail from January 12, 2023, until his death on January 26, 2023.

30.    As shown on the video[1] provided to the Estate on March 10, 2023 and filed by Defendants with the Court on March 13, 2023, the Sheriff's method of "detoxing" Tony was to lock him in a bare concrete "drunk tank" for fourteen days, denying him access to medical treatment, with no medication and without free access to water or to a toilet.

31.    For the duration of his stay at the jail, Tony was kept in cell BK5, the "drunk tank" in the booking area. This cell is not intended for long term housing of detainees, but rather is meant to hold detainees temporarily.

32.    The video provided to the Estate and filed by Defendants with the Court shows that on most days Tony received three meals per day in his cells, typically delivered by corrections officers either in a brown paper sack, called a "suicide sack" because that is what inmates on suicide watch get, or a white takeout-style carton. These

---

[1] This and following references are to the video with the filename Booking Desk # 1_2023_01_12_5PM_36_42.mp4 ("booking room video"), filed conventionally at Doc. 27.

sacks and cartons contained no beverages and no utensils, simply portions of food for Tony to eat with his fingers.

33.    BK5 lacks a bunk or other furnishings. There is a small hole in the floor that can be used as a toilet for liquid waste and can be flushed from the outside. However, the drain is not suitable for disposal of solid feces because it is covered with a grating, and solid feces will not go through the grating easily. The only way for BK5 to remain sanitary and not contaminated by feces is for the inmate to be allowed to leave the cell to use a bathroom in the booking area.

34.    Liquid waste does not go down the drain in the cell until a button is pushed on the wall outside the cell. Sewage backs up from the drain, creating, along with the presence of any solid feces in the cell, an obvious risk of infection and sepsis for someone forced to lie on the floor, especially with open wounds, and eating with his hands.

35.    During his nearly fourteen days in BK5, Tony was brought to use the shower or the bathroom a total of six times, and his cell was cleaned a total of four times prior to the morning of January 26, 2023. He was also brought out to attend virtual court on January 13. On several of the occasions when he was brought out of BK5 for a shower, Tony's naked body was visibly soiled with feces. BK5 was contaminated with feces for much of Tony's confinement in the cell.

36.     Lacking a toilet, the cell also has no sink or any other source of water or means of hygiene. The only way an inmate in BK5 has water to drink is if a corrections officer or trustee brings him water in a cup, or if the inmate is allowed out of the cell to get his own cup of water or to take a shower and is able to drink from the shower.

37.     The only way an inmate has an opportunity to bathe or clean himself, or even wash his hands, is if the inmate is allowed out of the cell and taken to the bathroom which has a shower in it.

38.     The cell is bare cement, the equivalent of a dog kennel. Video provided to the estate shows that Tony initially had a mat and what appears to be a blanket in the cell, and he later briefly had a suicide watch garment, colloquially referred to as a "turtle suit"; but the blanket, mat, and turtle suit all were taken from him early in his stay at the jail and never replaced.

39.     The blanket that was in the cell was taken from Tony at timestamp 25:47:40 of the booking room video. The mat that was in the cell was taken from Tony at timestamp 57:44:40 of the booking room video. The turtle suit was given at timestamp 101:52:01 and taken away at timestamp 117:13:09 of the booking room video.

40.     After the morning of Tuesday, January 17, 2023, Tony had no mat, no blanket, and no turtle suit in BK5 and had to lie naked on the bare concrete floor.

41.    Corrections staff have the ability to intentionally subject inmates in BK5, and to a lesser extent other inmates in the booking area cells, to frigid temperatures by means of the climate controls in the booking area. For this reason, BK5 is referred to by some longtime corrections staff and inmates as "the freezer."

42.    Tony had no cloth uniform, as a result of the Sheriff's "suicide watch" policy or protocol. He was eventually given a flimsy uniform made of non-cloth material, similar to a hospital gown, at 221:56:40 of the booking room video, but the material of this gown degraded under the stress of tossing and turning on a bare concrete floor. Tony spent most of his incarceration either mostly or completely naked on BK5's bare concrete floor.

### D.    Tony Was Denied Access to Medical and Mental Health Treatment.

43.    After an initial visit to the medical area upon his booking into jail on January 12, 2023, Tony was placed in BK5. After being placed in BK5, Tony received no medical treatment from medical personnel, not even after being tased on January 15, 2023. Even though medical staff were present in the booking area twice daily and otherwise as needed, once Tony was placed in BK5 at around 5:36 PM January 12, 2023, no medical personnel spoke to Tony without the closed door of BK5 between them, and no medical personnel physically examined him, took vital signs, or administered medication to Tony until the early morning hours of January 26, 2023.

44.    Tony's medical records state that he "required Haldol injection 1/14/23," however the booking video shows that Tony never left his cell on January 14, 2023, and further shows that medical personnel never entered his cell on that date or any other date prior to January 26, 2023, so unless the booking video has unexplained gaps or unless the date is wrong and he received the Haldol injection on January 12, 2023 prior to being placed in BK5, this entry in the medical records is incorrect, and Tony never received such treatment.

45.    Notes in Tony's medical records for January 17, 2023 state, in part, "Unable to perform medical intake. Patient remains uncooperative and combative. Jail staff does not feel safe removing inmate from cell for medical at this time" and "unable to do intake due to jail staff not being able to bring [h]im out due to being so combative."

46.    Similarly, the mental health professional was unable to access Tony to provide treatment, and unable to communicate with him effectively through the closed cell door on the two times the mental health professional attempted to do an intake.

47.    The mental health practitioner's note dated January 17, 2023 states, in part:

> Patient interviewed at his cell door, BK-5. Noted feces on the door and food pushed out of the bottom of the cell door. According to CO report, patient has been extremely confused, agitated and combative. At time of interview today, the patient appears to be more coherent than in previous days per CO report. He is able to have a logical conversation with me. Able to state his name but was unaware o[f] the time, place or situation. Re-oriented patient to time, place and situation. IT was

difficult to understand a significant portion of what he was trying to say due to difficulty hearing through the cell door…

48.    The mental health practitioner's note dated January 24, 2023 states "Attempted to interview patient for initial mental health evaluation. Patient remains in booking with CO's unwilling to remove him from his cell due to continued combative behavior. Patient was alert and attempted to communicate but his speech was indiscernible through the cell door. Will attempt to interview him again at a later date."

49.    All corrections officers were aware of Tony's serious medical need for mental health treatment, as an entry in Tony's medical records dated January 17, 2023 states "Per guards – 'thinks he is Jesus, extremely combative, spreading feces on walls, trying to assault guards, throwing food trays'." However, showing deliberate indifference to Plaintiff's serious need for such treatment, the named corrections officers prevented mental health practitioners from accessing Tony to provide such treatment.

50.    From 5:36 PM January 12, 2023 until the early morning hours of January 26, 2023, medical and mental health personnel were further denied access to Tony by a sign posted by order of the Sheriff or Jail Administrator White on the door of Tony's cell.

### E.    Tony Was Tazed and Repeatedly Dragged by Corrections Officers When He Could not Walk.

51.    On the morning of January 15, 2023, the booking room video shows that as corrections officers Braxton Kee and Morgan Madison were handing Tony his breakfast, Madison closed the door of the cell before Tony drew his hand back, causing the food to spill on the floor outside the cell, as shown on the booking room video at timestamp 57:33:37. Officers then shoved Tony back into the cell.

52.    Several minutes later, Kee, Madison, and Captain Arcelia Jottie Tidwell returned with a trustee to clean up the mess the officers had made. The trustee also began cleaning Tony's cell.

53.    As part of cleaning the cell, the trustee removed all trash from the cell, including removing the mat Tony had been lying on for the last two weeks and putting the mat in the trash. Subsequently, the mat was not replaced.

54.    At some point, Braxton Kee tased Tony inside the cell. Tony then was driven out of the cell with the taser wires still in him, and he collapsed onto the floor outside the cell door. Corrections officers immediately placed handcuffs on Tony.

55.    Appearing too weak to move, Tony lay on the floor of the booking area surrounded by corrections officers and under their complete control, as shown on the booking room video at timestamp 57:45:46 to 57:50:50.

56.    As a result of years of methamphetamine abuse and personal neglect, Tony had lost his teeth, and he used a set of false teeth to eat. He was wearing the teeth at the time of his arrest.

57.    The tasing caused Tony's false teeth to pop out. Instead of being returned to Tony, the teeth were recovered by the trustee after being kicked by Captain Tidwell, as shown on the booking room video at timestamp 57:42:02, and the teeth were then placed by her in a property bag. After Tony's death, his mother received the teeth in a sealed property bag bearing a date of 1/15/2023.

58.    After this date, January 15, 2023, Tony would not have been able to chew solid food effectively.

59.    As part of the same incident, Kee and Madison then stood Tony up, with Tony apparently too weak to stand on his own, with the taser prongs and wires still in him, and propelled him naked on his feet toward the office adjacent to the booking area where there is a bathroom and a shower, with Madison coming behind holding the taser, as shown on the booking room video at 57:50:50.

60.    Unable to remain on feet after being tased and handcuffed, Tony fell naked and handcuffed in the doorway of the office, as shown on the booking room video at 57:51:48. Kee then dragged Tony into the office by one ankle, with Tony sliding on the floor on his back and visibly impacting against the desk in the office, moving

it slightly out of place. Madison and Key then forced Tony, still handcuffed, onto his feet and into the bathroom in the back corner of the office.

61.    A moment later, Tony came out of the bathroom, and Madison violently knocked him to the floor against the desk as shown on the booking room video at 57:56:02, possibly again deploying the taser whose prongs were still attached to Tony's body. Tony was still handcuffed when Madison knocked him down against the desk.

62.    Kee then again dragged Tony out of the office through the booking area toward BK5 while Madison followed holding the taser, the prongs and wires of which appear to still be attached to Tony's body, as shown on the booking room video at 57:57:50. There was no need to drag Tony, as the Sheriff's Office has a wheelchair available. The sliding likely left scrapes on Tony's back, creating an extreme risk of infection and sepsis from lying on the bare concrete, feces-contaminated floor of BK5 without medical attention.

63.    With Tidwell observing, Kee dragged Tony by one ankle all the way across the booking area and into BK5, with Tony sliding over the booking room floor on his back, likely leaving scrapes.

64.    At no point during this episode did Tony offer any evident resistance, and he was not combative. Rather, he appeared too weak to stand for long or remain on his

feet under his own strength. Tony was handcuffed the entire time corrections officers were dragging him to and from the booking office.

65.    At 57:58:59, Kee and Madison entered BK5. Kee and/or Madison apparently yanked out the taser prongs from Plaintiff's body themselves, or they left the taser prongs in Tony's body for him to pull out himself, or the prongs came out on their own.

66.    The booking room video shows that Tony did not receive treatment by medical personnel in the minutes, hours, or days after he was tased. In failing to obtain medical treatment for Tony's taser wounds, Kee, Madison, and Tidwell were deliberately indifferent to Tony's serious medical need for treatment after being tased and to a substantial risk of infection and/or sepsis as a result of being placed back in the feces-contaminated environment of BK5 with such wounds.

### F.    Tony Was Denied Medical Treatment by Deputies Who Dragged Him When He Could Not Walk on His Own.

67.    Instead of receiving medical and mental health treatment, Tony was left on a cement floor in a feces-contaminated environment with open, untreated wounds, presenting an obvious and unreasonable risk of infection, sepsis, and serious bodily injury or death. Defendants Kee and Madison were deliberately indifferent to this risk, as they knew that anyone with taser wounds must receive medical treatment.

68.    Tony continued to suffer from serious medical and psychiatric needs while incarcerated as a pretrial detainee at the jail. These needs were obvious to every corrections officer and all jail personnel who came into contact with him.

69.    On the morning of Thursday, January 19, 2023, the booking room video at timestamp 162:49:29 shows Tony lying with one arm out of the cell, apparently begging the COs for a second cup of water after they have given one cup of water to him. Instead of giving Tony a second cup of water, Madison enters the cell, drags Tony back away from the door, and he and Kee close the door at 162:53:48

70.    The next day, on the night of January 20, Tony slipped, apparently because he was wet and naked from the shower. His legs buckled beneath him, and he fell on the booking room floor on his way back to BK5 after coming out of the shower, as shown on the booking room video at timestamp 194:39:45.

71.    The video shows that after Tony fell, either because Tony could not stand back up or because Denzel Mitchell did not want to wait for him to stand or did not want to get a wheelchair to assist him, Mitchell dragged Tony back to the edge of BK5 by Tony's ankles. Mitchell and another CO then lifted Tony to his full height because Tony still could not stand on his own. The two COs together then shoved Tony forcefully into the cell, and Tony tumbled to the floor before they shut the door.

### G. <u>Tony Leaves His Cell for the Last Time Prior to January 26, 2023 on Saturday, January 21, 2023</u>.

72.    Prior to the morning of January 26, 2023, the last time Tony was outside his cell was early evening on Saturday, January 21, 2023, when corrections officers opened the cell and provided Tony with a gown made of a flimsy non-fabric material, as shown on the booking room video at timestamp 221:56:30.

73.    The booking room video shows Tony partially rolling out of his cell before corrections officers hauled him to his feet. Tony stood hunched over with his hands on his knees, leaning against the doorframe of BK5 as a trustee fastened the gown around him.

74.    Tony stood outside his cell for several minutes while a group of corrections officers and a trustee conversed around him, but he did not leave the vicinity of the cell. The booking room video shows that Tony had difficulty remaining standing, as he continued stooping down, leaning his hands on his thighs and at one point seeming on the verge of sitting before backing into the cell.

75.    At 222:04:48, corrections officers returned Tony to the cell without taking him to the bathroom or shower. Tony would not leave the cell again after this until the morning of January 26, 2023.

### H. <u>Corrections Officers Denied Tony Water for Over 70 Hours</u>.

76.    As stated above, because BK5 lacks a water source, the only way an inmate in BK5 has water to drink is if a corrections officer or trustee brings him water in a

cup, or if the inmate is allowed out of the cell to get his own cup of water or to take a shower and is able to drink from the shower.

77.    Tony's meals, whether provided in a paper sack or a white takeout-style container, did not include a beverage.

78.    At various points in the booking room video Tony can be seen holding a cup to the window of his cell as if asking for water.

79.    During his time in BK5, Tony was constantly asking corrections officers for water.

80.    The video shows COs bringing cups of water to other inmates in cells in the booking area. The video also shows that during the night, inmates would be allowed out to use bathroom or the shower and would sometimes bring back cups of water.

81.    However, the video provided to the Estate shows that Tony never left BK5 on January 23, 24, or 25, until he was carried out of it on January 26.

82.    Prior to the day of his death, Tony had his last cup of water at around 4:30 AM on Monday, January 23, 2023, when Corrections Officer Daniel Brown brought Tony a cup of water, as shown on the booking room video at timestamp 251:49:21.

83.    The heroic corrections officer who preserved the security camera footage after Tony's death last saw him alive at 6:00 AM on the morning of Wednesday, January 25, 2022, when she went off her shift.

84.    At that time, Tony was awake and talkative in the isolation cell in the booking area.

85.    Tony's condition worsened throughout the day of January 25, 2022.

86.    COs Joshua Jones, Morgan Madison, and Dayton Wakefield opened Tony's cell door to toss in a sack of food at lunchtime on January 25, 2022, at approximately 10:45 AM, as shown on the booking room video at timestamp 305:51:43. None of these three corrections officers provided Tony with water or sought medical attention for him despite Tony's obvious weakened state and obvious need for hydration, in deliberate indifference to Tony's serious medical needs.

87.    COs Dayton Wakefield and Josh Jones similarly partially opened Tony's cell door to toss in a sack of food at dinnertime on January 25, 2022, at approximately 3:45 PM, as shown on the booking video at timestamp 310:37:51. However, neither corrections officer provided Tony with water or sought medical attention for him despite Tony's obvious weakened state and obvious need for hydration, in deliberate indifference to Tony's serious medical needs.

88.    At approximately 10 PM on January 25, 2022, Corrections Officers Bailey Ganey and Braxton Kee can be seen on the booking room video at timestamp 316:20:06 opening Tony's cell door and speaking to him or shouting at him. (The video has no sound). Tony lies on the floor and is barely able to raise his head in response.

89.    Kee's previous employment was with Regional Paramedic Services, and Tony's obvious serious need for medical attention at this point and his obvious urgent need for water after nearly 65 hours without hydration were obvious to Kee and Ganey. Nevertheless, Ganey and Kee failed to summon emergency medical services and failed to bring him water, but instead closed Mitchell's cell door and left him there overnight after speaking to him or yelling at him and receiving no response, in deliberate indifference to Tony's serious medical needs.

90.    Corrections officers on duty from lunchtime January 25 through the early morning hours of January 26, including Joshua Jones, Morgan Madison, Dayton Wakefield, Bailey Ganey, and Braxton Kee, were consciously aware that Tony was being deprived of water for an objectively unreasonable length of time.

91.    These officers were aware that Tony was being deprived of water, and they acted with deliberate indifference to Tony's serious medical needs for hydration and for medical treatment for dehydration, as the medical notes from the hospital state "I was also **told by one of the deputies** that the patient has not been eating **or drinking for several days**."

### I.    <u>Corrections Officers Intentionally Exposed Tony to Frigid Temperatures in His Cell On the Night of January 25 to January 26</u>

92.    During the night of January 25 to January 26, corrections officers intentionally caused extremely cold air to blow through the roof vents in other booking cells,

causing at least one inmate held in another booking cell to begin shivering uncontrollably.

93.    The outside temperature that night was in the low thirties Fahrenheit, so if it was simply outside air blowing into the cells, that air was frigid. BK5, referred to by some longtime corrections staff and inmates as "the freezer" because of the ability of corrections staff to subject inmates to frigid temperatures there, would have been the coldest cell in the booking area. Inmates housed there report being able to see their breath because it was so cold and that their digits would turn numb.

94.    An inmate in another holding cell in the booking area told corrections officers on duty overnight from January 25 to January 26 repeatedly, at every opportunity, that it was freezing in her cell, that she was too cold, and that she needed to warm up. When the inmate complained about the cold, she was told repeatedly to "live with it," and "too bad" or the inmate was just ignored.

95.    Deputies deliberately exposed Mitchell to a frigid environment by causing the prison's climate control system to blow extremely cold air into his cell, BK5, referred to by some longtime corrections officers and inmates as the "freezer" because of the ability of corrections staff to subject inmates to frigid temperatures there, causing Mitchell, already stressed by dehydration from receiving no water for over two days, to become severely hypothermic overnight and into the morning hours.

**J.    At Least 11 Hours Pass After Tony's Need for Emergency Medical Treatment is Obvious Before He Is Transported to the Hospital.**

96.    Denzel Mitchell was the jail supervisor on duty overnight from January 25 to January 26, 2023. The other corrections officers on duty that night include Braxton Kee, Bailey Ganey, Katherine Clingan, and Jacob Smith.

97.    Each of these individuals was deliberately indifferent to Tony's obvious serious medical needs. Each of them, at a minimum, failed to intervene to prevent Tony from being subjected to frigid temperatures in his cell.

98.    From 10 PM on January 25, 2022, when Tony's serious need for emergency medical attention was obvious, at least eleven hours passed before he was transported to Walker County Medical Center, despite his obvious serious medical need for emergency medical treatment throughout that time.

99.    Hour by hour, Tony's chances of survival dwindled, as captured in the video footage that has been provided to the Estate.

**K.    Security Footage from 3:30 AM Shows Tony Lying on the Cement Floor of His Cell in Urgent Need of Emergency Medical Treatment.**

100.    Braxton Kee opened Tony's cell door again at around 3:30 the next morning for breakfast, as shown on the booking room video at timestamp 321:48:50. Holding the bag of food, he shines a light on Tony, and Denzel Mitchell approaches the cell.

101.   About five minutes later, Denzel Mitchell brings a cup of water to the cell—the first water Tony has been given in over seventy hours, according to the booking room video. However, Tony is too weak from dehydration and hypothermia to sit up and drink the water at this point.

102.   Kee can be seen on the booking room video yanking Tony up by the wrist at timestamp 321:56:36, but Tony is unable to remain in a sitting position under his own power and slumps back down onto the concrete floor.

103.   Shortly thereafter, Kee and Jacob Smith can be seen rolling in a vital signs machine. Kee's report states "OFFICER KEE NOTICED THE INMATE LOOKED PALE. OFFICER KEE AND OFFICER SMITH TOOK INMATES BLOOD PRESSURE CHECKED HEART RATE AND OXYGEN LEVEL. AFTER OXYGEN LEVEL AND HEART RATE READ LOW OFFICER KEE NOTIFIED CAPTAIN TIDWELL AND MEDICAL STAFF. MEDICAL STAFF ARRIVED AT APPROX. 4:17 AM. MEDICAL ADVISED THE INMATE WOULD NEED TO GO TO THE HOSPITAL WHEN ONCOMING SHIFT ARRIVED. ONCOMING SHIFT WAS ADVISED." The next shift did not start for another couple of hours at six AM.

**L.**    **Nurse Practitioner Herron Told Kee, Smith, and Mitchell that It Was Okay to Wait for Shift Change to Transport Tony to the Hospital.**

104.   Around 4 AM, at timestamp 322:19:40, the booking room video shows Braxton Kee leading Aleisha Herron, the jail's nurse practitioner, to the holding cell in which Tony can be seen lying naked on the bare cement floor. Supervisor Denzel Mitchell is also present and participating.

105.   At various points around timestamp 322:24:00, Kee and Mitchell can be seen clowning and laughing as Tony lies motionless and naked on the bare cement floor in the open cell behind them, obviously in severe medical distress and in need of immediate emergency medical treatment.

106.   Herron, the jail nurse practitioner, an agent and employee of Defendant QCHC, Inc., enters the cell at 322:19:28 and spends approximately two and a half minutes inside with Tony, until 3:22:22:02, and does not summon an ambulance even though Tony's severe medical distress is obvious.

107.   Herron's notes from the jail medical records indicate that Herron observed that Mitchell was "cool to the touch" and noted that she was "unable to obtain blood pressure due to dehydration and cold temperature."

108.   Herron's notes record the following observations: "asleep in fetal position, cool to the touch, difficult to arouse but eyes open to commands. no verbal communication, moans and mumbles. Emaciated, naked, redness, petechia noted on

multiple areas of the skin and bruising on joints. Laying on left side, bruising on right up visible. Right arm has redness and bruising. mild edema in right hand…"

109.   Herron wrote "inmate needs to be sent out to ER, due to dehydration."

110.   However, corrections staff claim that Herron instructed them it would be okay to wait to transport Tony to the hospital until after the start of the upcoming shift, which began at 6:00 AM.

111.   Braxton Kee's incident report states, in part, that "MEDICAL ADVISED THE INMATE WOULD NEED TO GO TO THE HOSPITAL WHEN ONCOMING SHIFT ARRIVED," i.e. after 6:00 AM. Similarly, Jacob Smith's incident report states, in part, "MEDICAL STAFF ADVISED INMATE WOULD NEED TO BE TRANSPORTED UPON DAY SHIFT ARRIVAL."

112.   Denzel Mitchell's report states, in part, "WHEN THE NURSE ARRIVED AT 4:17 A.M. SHE INSTANTLY STARTED GETTING HIS VITALS AFTER RECEIVING HIS VITALS NURSE ADVISED US TO INFORM THE UPCOMING SHIFT TO SEND MR. ANTHONY MITCHELL TO THE HOSPITAL."

113.   At timestamp 322:25:35, Tony, lying naked among piles of trash on the floor of BK5, can be seen raising his head, peering out at deputies as if pleading for help. But Braxton Kee closes the door of the cell and turns out the light, leaving Tony alone in the dark.

**M.    Security Footage from around the Time of the 6 AM Shift Change Shows Multiple Corrections Officers and Medical Personnel Exhibiting Deliberate Indifference.**

114.    Two hours later, around six AM, Morgan Madison opened the cell door, stood looking at Tony, then closed the cell door again, as shown on the booking room video at timestamp 324:16:31.

115.    Around half an hour later, at timestamp 324:47:07, Shoemaker and Morgan Madison can be seen entering the cell with a sleeping mat. At timestamp 324:40:22, another CO can be seen entering with a blanket.

116.    This is the first sleeping mat Tony had since January 15, 2023, when the mat that was in the cell when Tony arrived was taken away, and the first blanket Tony had in the cell since January 13, 2023.

117.    Around the same time, at timestamp 324:49:08, Nurse Brad Allred, an agent and employee of Defendant QCHC, Inc., stood at the door of the cell looking in at Tony but provided no medical treatment, though Tony's need for emergency medical intervention is obvious.

118.    Instead of calling an ambulance, Benjamin Shoemaker and Morgan Madison, at timestamp 324:48:40, focused their energies on sweeping trash out of the cell, in which the lights were now turned off, and cleaning it, evidently sweeping or

mopping around Tony as he lay dying on the floor, removing signs of the squalor in which Tony was forced to spend his final days.

119.  COs can be seen entering with cups of water or protein shake at 324:48:53 or 325:40:08, but again, Tony is too weak from dehydration and hypothermia to drink the water at this point.

120.  Shoemaker's report of this incident states, in part, that "LT. SHOEMAKER, CONTACTED CAPTAIN TIDWELL AND BRIEFED HER ON THE SITUATION. CAPTAIN TIDWELL ADVISED SHE WAS EN-ROUTE AND THAT C/O TIDWELL WOULD BE ON SCENE WITH SOME PROTEIN SHAKES. LT. SHOEMAKER RECEIVED THE PROTEIN SHAKES AND ASSISTED INMATE MITCHELL WITH DRINKING A SIP AT A TIME AT WHICH TIME HE REFUSED ANYTHING MORE. INMATE MITCHELL THEN BECAME RESISTANT TO ANY HELP TO HIM."

121.  The booking room video subsequently shows Morgan Madison entering the cell carrying an orange jail uniform at timestamp 326:02:55. This occurred at approximately 7:45 AM.

122.  Brad Allred, the nurse, can be seen passing with the "pill call" cart.

123.  None of these individuals called an ambulance or otherwise took steps to provide Tony with the immediate emergency medical treatment he so obviously needed.

**N.**    **At around 8:30 AM, Corrections Officers Remove Tony from the Cell, then Return Him to the Cell to Conceal His Presence as a Woman is Booked.**

124.    Around 8:30 AM, at timestamp 327:02:00 on the booking room video, Shoemaker rolled a wheelchair into the cell. Shoemaker, with the help of either Farley or Holtzman, then brought Tony out of the cell in the wheelchair.

125.    For the first time in around two weeks of detention, Tony was now clothed. Deputies had placed an orange jail uniform on him.

126.    At timestamp 327:03:04, Tony's body fell out of the wheelchair outside the cell and onto the floor. The deputies lifted him back into it. Deputies can be seen shackling Tony's feet as his body makes slow, seemingly spasmodic movements.

127.    After initially placing him in the chair, deputies picked Tony up and carried him back inside the cell at 327:05:32 as a new female detainee was brought into the booking area and processed, further delaying Tony's access to the emergency medical treatment he obviously urgently required. Again, none of the deputies—Shoemaker, Wakefield, Farley, or Holtzman—called for an ambulance.

128. Shoemaker's report states, in part, "ONCE IN THE WHEELCHAIR, WE WERE INFORMED OF A DISORDERLY PERSON BEING BROUGHT INTO BOOKING."

129.   Even after the female detainee had been processed, Shoemaker, Wakefield, Farley, and Holtzman showed no urgency, but stood around talking outside the closed cell door for several minutes, as shown at timestamp 327:08:37.

130.   At long last, at timestamp 327:12:04, the four corrections officers brought Tony out again and carried him through the door to the sally port to place him in the sheriff's department SUV for transport to the hospital, as described below.

> **O.    Attempting to Cover Up the Truth, T.J. Armstrong Releases a False Statement that Tony Was "Alert and Conscious" When He Left the Jail and Lies to Tony's Family about his Condition.**

131. Defendant Armstrong, the Sheriff's communications officer and his authorized agent for making statements to the public, provided a statement to news media regarding Tony's death, quoting in part as follows: "On Thursday, January 27th, an inmate in the Walker County Jail was provided a routine medical check by jail medical staff. Medical staff determined the inmate needed to be transported to the hospital for further evaluation. The inmate was alert and conscious when he left the facility and arrived at the hospital. Shortly after arrival at the hospital, the inmate suffered a medical emergency and became unresponsive. Lifesaving efforts were

performed by hospital staff and the inmate was ultimately revived. Unfortunately, a

short time later, the inmate passed away."[2]

132.  Similarly, Jail Administrator Justin White informed the SBI Director Chris

Inabinett in a letter quoted in part below (emphasis added):

> The inmate has been non-compliant since his admission and refused to do almost anything that was asked of him. **When officers attempted to take him out of the facility to the hospital, he did not assist them and had to be taken out via wheelchair. According to officers, he was awake and responsive leaving the facility.** Officers arrived at Walker Baptist and went inside to get a wheelchair and the inmate was still responsive, but then became unresponsive shortly thereafter…

133.  These statements were false, as Tony was not "alert and conscious when he

left the facility and arrived at the hospital," he did not refuse to assist deputies but

rather was unconscious or deceased, and he was not "awake and responsive leaving

the facility."

## P.    Surveillance Video Shows that Tony Was not "Alert and Conscious" When He Left the Jail.

134.  Contrary to the statement Armstrong issued to the press and contrary to what

Jail Administrator White told SBI, Tony was not "alert and conscious" or "awake

---

[2] https://www.cbs42.com/news/local/an-alabama-man-was-arrested-during-a-welfare-check-two-weeks-later-he-was-dead/. The date in Armstrong's statement is incorrect, as Tony was transported to the hospital on Thursday, January 26.

and responsive" when he left the jail and arrived at the hospital. He was either unconscious or deceased.

135.    Surveillance video from the jail's security camera system, filed by Defendant as Sallyport exit_2023_01_26_6AM_00_00.mp4 ("sally port exit video"), shows corrections officers Jeremy Farley and Richard Holtzman carrying Tony's limp body into the sally port area at the jail on the morning of January 26, 2023, while corrections officers Benjamin Shoemaker and Dayton Wakefield assist them with opening and closing doors. This sequence appears at timestamp 2:54:12 in the sally port exit video, corresponding to a time of 8:54 AM on January 26, 2023.

136.    No medical personnel appear in this portion of the security camera footage. Farley and Holtzman moved without urgency as they carried Tony through a doorway into the loading and unloading area. Tony was not handcuffed, although his feet were shackled.

137.    Holtzman wrote an incident report falsely stating that "DURING THIS TIME INMATE MITCHELL WAS RESPONSIVE MAKING EYE CONTACT AND UNDERSTANDING VERBAL COMMANDS," but the video shows otherwise.

138.    Ahead of them, Benjamin Shoemaker opened the rear door of a sheriff's department prisoner transport SUV.

139.    The corrections officers carried Tony one on either side, each holding him by the jail uniform at the shoulder and hips. Tony's shackled legs hung in the air.

140. As the corrections officers neared the SUV, they lay Tony on the ground beside the SUV, letting his head fall back on the cement while they stood around, seeming to deliberate how best to place the body in the vehicle. Tony lay between them on the cement floor next to the SUV's open rear passenger door as the deputies conferred.

141. The corrections officers lifted Tony's body and placed it across the backseat of the Sheriff's Department SUV. On the video the COs appear to push the body into the SUV, adjusting its position, before closing the door.

142. Again moving with no particular urgency, the deputies walked around to get into the SUV.

143. This video captured events that took place around 8:55 AM on January 26, 2023, after Tony had languished for approximately three days on a bare cement floor with no water as his life trickled away.

### Q.    Tony's Heart Has Stopped by the Time Deputies Reach the Hospital, Over Eleven Hours After Deputies Observed Tony in Acute Distress.

144. By the time deputies arrived with Tony at the hospital at 9:23 AM—over five hours after deputies were captured on video laughing and joking while Tony lay naked on the cement floor of his cell in obvious need of emergency medical treatment, and over eleven hours after Braxton Kee and Bailey Ganey found Mitchell

lying on the floor of his cell in obvious severe distress at around 10 PM on January 25—he had no pulse and only agonal respirations of 2-4 breaths per minute.

145.    Deputies did not inform hospital staff that Tony had been subjected to frigid temperatures or that he was hypothermic. Doctors learned Tony was hypothermic only when they took his temperature after beginning emergency resuscitation efforts. Learning that Tony was hypothermic caused physicians to immediately change their course of treatment, as the measures they had initially employed were inappropriate to resuscitate a person who is severely hypothermic.

146.    Despite the heroic efforts of emergency medical personnel at Walker Baptist Hospital to warm Tony's body and over three hours of continual attempts to resuscitate him, Tony was pronounced dead at 1:15 PM that afternoon.

> **R.    Medical Records Indicate that Tony's Heart Stopped Before He Arrived at the Hospital and Never Restarted, Contradicting Corrections' Officers' Statements that He Was 'Responsive.'**

147.    Doctor Timothy Jordan, the ER Provider, made the following note that is contained in Tony's medical records:

> I have limited information on this patient other than was provided by sheriff deputies that accompanied the patient to the hospital. I was told by one of the deputies that the patient has been incarcerated since January 12th. I was also told by the deputies that the patient has not been eating or drinking for several days. He was brought to the emergency room by sheriff deputies in a car for evaluation. One of our nurses noted the sheriffs moving the patient out of the vehicle and putting him in a wheelchair and he went outside and offered to move him to a stretcher. At that point he was noted to have agonal respirations breathing 2-4

times a minute. He was rushed into the ER and moved to our stretcher. He was unresponsive apneic and pulseless and cold to the touch. CPR was started and handcuffs were removed. His mother arrived in the emergency room about 3-1/2 hours into resuscitation and gave additional history. She said her son has been drug addicted for years. He has developed multiple abscesses. He has been suicidal. He is recently been confused. She is not heard from him in weeks. She requested that we not continue resuscitation.

148. Another note in the file states that during the attempted resuscitation, "Patient was unresponsive but occasionally made some agonal movements including swallowing and minor movements of an arm or leg. This is while CPR with external compression devices in progress. Initial rectal temperature was 72° F 22° centigrade. He appeared to have vomitus on his uniform."

149. Corrections Officer Holtzman included in his report a statement that "UPON ARRIVAL TO WALKER BAPTIST HOSPITAL INMATE MITCHELL WENT FROM AN UPRIGHT POSITION AND MADE AN AUDIBLE NOISE I THEN ASKED INMATE MITCHELL 'YOU OKAY BUDDY' AND INMATE MITCHELL THEN REPLIED WITH A GRUNT." Similarly, Jeremy Farley wrote a report including a statement that upon arrival at Walker Baptist Tony "went from an upright position in the seat, then leaned against the back seat which made an audible noise. Corrections Deputy Holtzman then asked Mitchell 'hey buddy, are you okay?' To which Inmate Mitchell replied with an unintelligible grunt."

150.    Corrections Officer Holtzman further included in his report a statement that as nurses were arranging a stretcher to take Tony inside, "MITCHELL WAS RESPONSIVE MAKING NOISES AND HIS EYES WERE BLINKING."

151.    Contrary to these statements, at no point do the medical records indicate that Tony had the capacity to be "responsive" around the time he arrived at the hospital.

152.    Rather, the notes state, "Pupils were initially fixed and dilated but became responsive after CPR was initiated" and "The patient remained in asystole PE a and occasionally Vfib. No spontaneous pulse was ever palpated."

153.    The doctor's notes further state, "There was never any purposeful movement or response to pain."

154.    As quoted above, the doctor's notes state, "I am not sure what circumstances the patient was held in incarceration but it is difficult to understand a rectal temperature of 72° F 22° centigrade while someone is incarcerated in jail. The cause of his hypothermia is not clear. It is possible he had a underlying medical condition resulting in hypothermia. I do not know if he could have been exposed to a cold environment. I do believe that hypothermia was the ultimate cause of his death."

### S    Armstrong Gives False Information to the Family about Tony's Condition.

155.    Tony was declared dead on Thursday, January 26, 2023, at 1:15 PM at Walker Baptist Medical Center.

156.   At some point that day, Steve Mitchell, Tony's cousin who had called 911, received a call from Defendant Armstrong, who was at the hospital with Tony.

157.   Armstrong told Steve that for the last week and a half "we've had a time with Tony."

158.   Armstrong told Steve that Tony had refused to eat, that he had refused to speak with jail personnel, and that he had allegedly refused to consent to a psychiatric evaluation. Armstrong described an incident when Tony had allegedly thrown feces at jail personnel.

159.   Armstrong further told Steve that it was "the worst case of addiction we've ever seen."

160.   Showing that Armstrong was aware that Tony had been hypothermic prior to his transportation to the jail, Armstrong told Steve that Tony's body temperature had started dropping that morning and that they'd had to carry him to the hospital. However, Armstrong, who was present at the hospital, did not inform physicians there that Tony was hypothermic.

161.   Armstrong asked Steve to bring Tony's mother to the hospital, because in Armstrong's words, "Tony's not going to live."

162.   Armstrong also falsely told Steve that when deputies got Tony to the hospital, the doctor had asked Tony to sit up, and Tony had sat up, and that at this point, he had a massive heart attack, but that for now they were keeping him alive.

163.   Along with Armstrong, Sheriff Nick Smith was personally present at the hospital. When Tony's mother, Miranda Mitchell, and his cousin, Ethan Mitchell, arrived at the hospital, Smith mentioned nothing to them about Tony being hypothermic or about how he had gotten in that condition.

164.   Smith told the Mitchells that one of his corrections officers had informed Smith that Tony had been "looking a little peakish this morning" and that he seemed "dehydrated" and that the nurse had thought he should be brought into the hospital to be checked out, and that some unspecified medical emergency had occurred after their arrival at the hospital.

### T.    The Sheriff and T.J. Armstrong Participated in the Scheme to Violate Tony's Constitutional Rights and Ratified the Conduct of Deputies.

165.   Sheriff Nick Smith and communications officer T. J. Armstrong participated in the scheme to deny Tony's constitutional rights and ratified the conduct of the deputies who violated Tony's constitutional rights by issuing a false statement to news media regarding Tony's death, quoting in part in news media as follows: "On Thursday, January 27th, an inmate in the Walker County Jail was provided a routine medical check by jail medical staff. Medical staff determined the inmate needed to be transported to the hospital for further evaluation. The inmate was alert and conscious when he left the facility and arrived at the hospital. Shortly after arrival at the hospital, the inmate suffered a medical emergency and became unresponsive.

Life saving efforts were performed by hospital staff and the inmate was ultimately revived. Unfortunately, a short time later, the inmate passed away."

166.   Armstrong and Smith also participated in the scheme to deny Tony's constitutional rights by giving false information to the family about his condition, including telling Tony's cousin Steve that when deputies got Tony to the hospital, the doctor had asked Tony to sit up, and Tony had sat up, and that at this point, he had a massive heart attack, but that for now they were keeping him alive, and that Tony had been "looking a little peakish this morning," and that some unspecified medical emergency had occurred after their arrival at the hospital. Armstrong and Smith also participated in the scheme to deny Tony's constitutional rights by failing to give essential information to emergency room physicians, as Armstrong and Smith were present at the hospital but did not inform doctors there that Tony's body temperature had been "dropping" earlier, as Armstrong told Steve Mitchell when he called him that afternoon, as described in paragraph 160, above.

167.   Jail Administrator Justin White participated in the scheme to deny Tony's constitutional rights by giving false information to ABI regarding Tony's condition when he left the Walker County Jail, including telling ABI that Tony "did not assist them and had to be taken out via wheelchair" and that "he was awake and responsive leaving the facility," as described in paragraph 132, above.

168.  Sheriff Nick Smith, Investigator Carl Carpenter, and T.J. Armstrong participated in the scheme to deny Tony's constitutional rights and ratified the conduct of the deputies who violated Tony's constitutional rights by investigating the corrections officer who preserved the video of Tony being carried into the sallyport, along with the other videos referenced above, and retaliating against that person by interrogating her, confiscating her phone and imaging its contents, suspending her, terminating her employment for allegedly leaking the video contradicting Armstrong's statement, and sending an officer to intimidate her. Smith, Carpenter, and Armstrong further participated in the scheme to deny Tony's constitutional rights and ratified the conduct of the deputies who violated Tony's constitutional rights by procuring a warrant to search the phone of the Jasper City police officer who received the video from the corrections officer who preserved it.

169.  The remainder of the named defendants participated in the scheme to deny Tony's constitutional rights by delaying seeking medical treatment and failing to intervene for nearly eleven hours as Tony lay severely dehydrated and dying on the concrete floor of the cell, such that Tony did not survive to tell the story of what happened to him.

170.  Sheriff Nick Smith ratified the conduct of Morgan Madison by selecting him as the "Corrections Officer of the Month" immediately after these events.

**First Cause of Action: Wrongful Death – Substantive Due Process Clause of the Fourteenth Amendment to the United States Constitution via 42 USC §1983 – All Defendants Are Sued in their Individual Capacities.**

171.   The corrections officers, Sheriff Smith, and Jail Administrator White denied Tony medical treatment or caused him to be denied access to medical treatment while he lay in a feces-contaminated environment for over two weeks, with open wounds, while forced to eat with his hands, creating an unreasonable and substantial risk of infection, sepsis, and serious injury or death. These conditions of confinement and the unreasonable risk of serious injury to Tony were obvious to every corrections officer who encountered Tony, and each was deliberately indifferent to that risk and failed to obtain medical treatment for him as his physical condition deteriorated.

172.   Corrections officers including Braxton Kee, Morgan Madison, Arcelia Jottie Tidwell, and Denzel Mitchell participated in tasing Plaintiff (Kee, Madison, and Tidwell) and dragging him across the booking room floor (Kee, Madison, Tidwell, and Mitchell) before returning him to his feces-contaminated cell without obtaining medical treatment for the injuries they inflicted on him, showing deliberate indifference to a substantial risk of bodily injury, infection, sepsis, and death.

173.   As discussed above, corrections officers further denied Tony water for a period of nearly seventy hours, from January 23, 2023 at approximately 4:30 AM until around 3:30 AM January 26, 2023. By lunchtime on January 25, 2023, Tony's need for emergency medical treatment for dehydration was obvious. Corrections

officers on duty from lunchtime January 25 through the early morning hours of January 26, including Joshua Jones, Morgan Madison, Dayton Wakefield, Bailey Ganey, and Braxton Kee, were deliberately indifferent to Tony's serious medical need for water and for emergency treatment for dehydration.

174.    As discussed above, corrections officers on duty during the overnight shift from January 25 to January 26, 2023 intentionally exposed Tony to frigid temperatures in his cell for a substantial period of time during the night of January 25 to January 26, 2023. The severity and duration of the exposure to the extreme cold temperature, sufficient to lower Tony's body temperature to seventy-two degrees Fahrenheit or lower, represented a substantial risk of harm to Tony's safety and health, violating his substantive due process rights as a pretrial detainee under the Fourteenth Amendment of the United States Constitution. The corrections officers acted with deliberate indifference and malice in intentionally exposing Tony to such conditions.

175.    Denzel Mitchell was the jail supervisor on duty overnight from January 25 to January 26, 2023. The other corrections officers on duty that night include Braxton Kee, Bailey Ganey, Katherine Clingan, and Jacob Smith. To the extent that each of these defendants did not actively participate in intentionally exposing Tony to frigid temperatures for a substantial period of time during the night of January 25 to January 26, 2023, each is liable for failure to intervene to stop the violation. Each

had the opportunity to intervene and summon an ambulance to take Tony to the emergency room at a time when such intervention would still have been effective. In particular, Kee and Ganey observed Tony's condition at around 10 PM on January 25 but failed to summon an ambulance or obtain water for him, despite his obvious serious need for immediate emergency medical treatment and hydration at that time.

176. Denzel Mitchell, Arcelia Jottie Tidwell, Braxton Kee, Bailey Ganey, Katherine Clingan, Jacob Smith, Jeremy Farley, Richard Holtzman, Benjamin Shoemaker, Morgan Madison, Dayton Wakefield, Joshua Jones, Nurse Practitioner Aleisha Herron, Nurse Brad Allred, and QCHC, Inc. are liable for being deliberately indifferent to Tony's obvious serious medical need for immediate emergency medical assistance by failing to call an ambulance and failing to intervene in the nearly eleven hours when Tony lay dying of dehydration and hypothermia on the floor of the isolation cell in the booking area. Each had the opportunity to intervene and summon an ambulance to take Tony to the emergency room at a time when such intervention would still have been effective.

177. QCHC, Inc., an entity performing a traditional state function, is liable for the actions and omissions of its agents, Herron and Allred, who were deliberately indifferent to Tony's serious medical need for emergency medical assistance, and who failed to intervene in the face of constitutional violations.

178.    Sheriff Nick Smith and communications officer T. J. Armstrong participated in the scheme to deny Tony's constitutional rights and ratified the conduct of the deputies who violated Tony's constitutional rights by issuing a false statement to news media regarding Tony's death, quoting in part in news media as follows: "On Thursday, January 27th, an inmate in the Walker County Jail was provided a routine medical check by jail medical staff. Medical staff determined the inmate needed to be transported to the hospital for further evaluation. The inmate was alert and conscious when he left the facility and arrived at the hospital. Shortly after arrival at the hospital, the inmate suffered a medical emergency and became unresponsive. Life saving efforts were performed by hospital staff and the inmate was ultimately revived. Unfortunately, a short time later, the inmate passed away."

179.    Jail Administrator Justin White participated in the scheme to deny Tony's constitutional rights by giving false and misleading information to ABI regarding Tony's condition when he left the Walker County Jail, including telling ABI that Tony "did not assist them and had to be taken out via wheelchair" and that "he was awake and responsive leaving the facility."

180.    Armstrong also participated in the scheme to deny Tony's constitutional rights by giving false information to the family about his condition, including telling Tony's cousin Steve that when deputies got Tony to the hospital, the doctor had asked Tony to sit up, and Tony had sat up, and that at this point, he had a massive

heart attack, but that for now they were keeping him alive. Armstrong and Smith also participated in the scheme to deny Tony's constitutional rights by failing to give essential information to emergency room physicians, as Armstrong and Smith were present at the hospital but did not inform doctors there that Tony's body temperature had been "dropping" earlier, as Armstrong told Steve Mitchell when he called him that afternoon.

181. Sheriff Nick Smith, Investigator Carl Carpenter, and T.J. Armstrong participated in the scheme to deny Tony's constitutional rights and ratified the conduct of the deputies who violated Tony's constitutional rights by investigating the corrections officer who preserved the video of Tony being carried into the sallyport, along with the other videos referenced above, and retaliating against that person by interrogating her, confiscating her phone and imaging its contents, suspending her, terminating her employment for allegedly leaking the video contradicting Armstrong's statement, and sending an officer to intimidate her. Smith, Carpenter, and Armstrong further participated in the scheme to deny Tony's constitutional rights and ratified the conduct of the deputies who violated Tony's constitutional rights by procuring a warrant to search the phone of the Jasper City police officer who received the video from the corrections officer who preserved it.

182. The remainder of the named defendants participated in the denial of Tony's constitutional rights by delaying seeking medical treatment for nearly eleven hours

as Tony lay dying on the concrete floor of the cell, such that Tony did not survive to tell the story of what happened to him.

183.  Sheriff Nick Smith further ratified the conduct of Morgan Madison by selecting him as "Corrections Officer of the Month" immediately after these events.

184.  Each of these defendants acted with malice and/or with deliberate indifference. Tony's death of hypothermia was the direct and proximate result of these defendants' deliberate indifference or malice, and of their ongoing denial of Tony's constitutional rights under a scheme that continued to operate after his death through the issuance of false statements to family members and the media and the investigation of and retaliation against the person who preserved the videos to prevent the public from learning the truth and to thwart justice from being done.

### Second Cause of Action – Wrongful Death – Policy or Practice Claim – Sheriff in His Official Capacity.

185.  The Walker County Sheriff has established an unconstitutional policy, practice, and/or custom of improperly training, re-training, instructing, supervising, disciplining, and/or allowing or encouraging its corrections officers to administer the Walker County Jail without regard to the constitutional rights of detainees housed there to receive prompt medical treatment for their serious medical needs, including but not limited to access to medical treatment and emergency medical treatment, access to mental health services, and transport to the emergency room.

186.   The Walker County Sheriff also has established an unconstitutional policy, practice, and/or custom of improperly training, re-training, instructing, supervising, and/or disciplining in regard to officers' duty to intervene when a fellow officer commits a Constitutional violation.

187.   In addition, the Walker County Sheriff has established an unconstitutional policy, practice, and/or custom of confining detainees on suicide watch in bare cement cells with sufficient means to keep warm, lacking immediate access to toilet, water, or other sufficient means to ensure personal hygiene, presenting a substantial risk to inmates' health and safety and a substantial risk of serious bodily harm in violation of inmates' rights under the Substantive Due Process Clause of the Fourteenth Amendment to the United States Constitution.

188.   In addition, the Walker County Sheriff has established an unconstitutional policy, practice, and/or custom of failing to ensure that inmates confined to isolation cells received adequate hydration, in violation of inmates' rights under the Substantive Due Process Clause of the Fourteenth Amendment to the United States Constitution.

189.   In addition, the Walker County Sheriff has established an unconstitutional policy, practice, and/or custom of intentionally exposing inmates to dangerously cold temperatures for an extended period of time through various means and in various locations throughout the jail, including but not limited to BK5, the "drunk

tank," referred to by some longtime corrections officers and inmates as the "freezer" because of the ability of corrections staff to subject inmates to frigid temperatures there, in violation of inmates' rights under the Substantive Due Process Clause of the Fourteenth Amendment to the United States Constitution.

190.   Due to these policies, practices, and/or customs, acts of misconduct amounting to deliberate indifference to inmates' medical needs and deliberate indifference to substantial risk of bodily injury or death are tolerated by the Sheriff and his deputies.

191.   The Sheriff has a policy or practice of covering up such acts of misconduct rather than disciplining the officers involved. As such, officers believed they were free to engage in such acts and ignore serious medical needs without regard to the rights of detainees at the jail and without any fear of consequences or discipline.

192.   The above-described policies, practices, and customs demonstrate deliberate indifference by the Sheriff toward the rights of individuals in custody in general, including but not limited to Tony.

193.   The above-described policies, practices, customs and deliberate indifference of the Sheriff were the moving force that directly and proximately caused Tony's death.

## **Request for Relief**

Plaintiff seeks the following relief:

Award judgment in her favor against Defendants jointly and severally in an amount to be determined by the jury for compensatory damages;

Award punitive damages against Defendants sufficient to punish them and to deter further wrongdoing;

Award Plaintiff reasonable attorney's fees and costs pursuant to 42 USC §1988;

Award Plaintiff all litigation expenses, costs, and pre-judgment and post-judgment interest at the maximum daily interest rate allowable by law; and

Such other relief as the Court deems just and proper.

### Jury Demand

The Plaintiff demands a trial by struck jury on all issues so triable.


Respectfully submitted,

*/s/ Jon C. Goldfarb*
Jon C. Goldfarb asb-5401-f58j
L. William Smith asb 8660-a61s
Christina M. Malmat asb-1214-y44q
Counsel for Plaintiff


**OF COUNSEL:**
Wiggins, Childs, Pantazis, Fisher,
& Goldfarb, LLC
301 19th Street North
Birmingham, AL 35203
Telephone No.: (205) 314-0500

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day the 20th of March, 2023, I served the foregoing via email to the following counsel of record:

J. Randall McNeill
Josh Willis
WEBB MCNEILL WALKER PC
One Commerce Street, Suite 7000 (36104)
Post Office Box 238
Montgomery, AL 36101-0238
(334) 262-1852 T
(334) 262-1889 F
rmcneill@wmwfirm.com
jwillis@wmwfirm.com
*Attorneys for Defendants Sheriff Nick Smith
and correctional officers T.J. Armstrong, Denzel
Mitchell, Braxton Kee, Bailey Gainey, Katherine
Clingan, Jacob Smith, Jeremy Farley, Richard
Holtzman, Benjamin Shoemaker, and
Dayton Wakefield and Investigator Carl Carpenter*

LaBella S. McCallum
Eric D. Hoaglund
MCCALLUM, HOAGLUN & MCCALLUM, LLP
905 Highway, Suite 201
Vestavia Hills, Alabama 35216
205-824-7767
edh@mhmfirm.com
lsm@mhmfirm.com
*Attorneys for Defendants Nurse Practitioner Aleisha Herron and
Brad Allred*

James C. King
KING, WILEY, AND WILLIAMS LLC.
1824 3rd Avenue South
Jasper, Alabama 35501
Telephone: (205) 221-3500
Email: jimmy@jasperlawyers.com
*Attorney for Defendant Aleisha Herron*

I further certify that the following were served via certified mail with a summons issued by the Court:

Arcelia Jottie Tidwell
Walker County Sheriff's Department
2001 2nd AVE
Jasper, AL 35501

Morgan Madison
Walker County Sheriff's Department
2001 2nd AVE
Jasper, AL 35501

Joshua Jones
Walker County Sheriff's Department
2001 2nd AVE
Jasper, AL 35501

QCHC, Inc.
c/o Bates, Johnny E
200 Narrows Parkway
Birmingham, AL 35242

/s/ L. William Smith
Of  Counsel